## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEFFREY REZNICK,** | : | **Civil No.  1:23-CV-018** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **MARTIN O'MALLEY,**[1] | : | |
| **Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

## I.    Introduction

The instant case calls upon us to address a recurring issue in Social Security litigation and consider the sufficiency of the Administrative Law Judge's (ALJ) analysis of medical source opinion evidence. The ALJ in claimant Jeffrey Reznick's case issued a partially favorable opinion which hinged upon his age, finding that, although the residual functional capacity (RFC) determination that he was capable of light work with certain limitations would preclude him from working once he reached Advanced Age, prior to the date he moved to this higher age bracket

---

[1]    Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Martin O'Malley is substituted for Kilolo Kijakazi as the defendant in this suit.

1

significant jobs existed in the national economy that he could perform. In fashioning this RFC, the ALJ relied upon the medical opinions of two State agency physicians and a consultative examiner, which considered the evidence only up to the end of 2020, but rejected the opinion of Reznick's treating physician.

Reznick now appeals this decision, arguing that the ALJ's failed to properly evaluate the medical opinion evidence, resulting in an RFC that is not supported by substantial evidence. Mindful of the fact that the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests," Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981), and considering the new framework of medical opinion evidence evaluation which eschews the treating physician rule in favor of a more holistic approach which examines all medical opinions in terms of their overall consistency and supportability, we find that this is a close case, but conclude that the ALJ's rejection of the treating source physician's opinion was not properly articulated and was not supported by substantial evidence. Therefore, for the reasons set forth below, we will remand this case for further consideration by the Commissioner.

## II.    **Statement of Facts and of the Case**

The administrative record of Reznick's disability application reveals the following essential facts: On September 1, 2020, Reznick protectively filed a Title

2

II application for a period of disability and disability insurance benefits, alleging disability beginning August 31, 2020. (Tr. 16). He was born on April 16, 1967, and was approximately 53 years old at the time of the alleged onset of his disability, which is considered closely approaching advanced age under the regulations. (Tr. 55). Notably, at the time of the hearing the ALJ considered Reznick to be in the next age category, noting that he was a few months from turning the age of 55 and should be considered a person of Advanced Age as of December 3, 2021. (Tr. 26). Reznick is a high school graduate and previously worked for many years as Journeyman painter from 1989 until the alleged disability onset date. (Tr. 220). In his application for disability benefits, Reznick alleged he was limited in his ability to work due to diabetes, neuropathy, lost half toe, bone spurs, and high blood pressure. (Tr. 219). At the disability hearing, Reznick testified that he stopped working after having trouble with his feet, including blisters and ulcers causing infections and eventually resulting in the amputation of half of his toe, as well as neuropathy and leg weakness. (Tr. 42-43). Medical records from that time show that he feared continuing to work would result in him losing more of his toes or his feet, a fear grounded in the arial amputations he had experienced. (Tr. 948).

The relevant medical records show that Reznick was diagnosed with diabetes in 2014 and an infection led to a partial toe amputation in 2019. (Tr. 468). He

3

reported he had to stop working in August 2020 because his edema got so bad that his work boots rubbed his feet and caused ulcerations which resulted in the partial amputation of his toe. (Tr. 493). During the relevant period, he presented to the Berwick Emergency Department on August 29, 2020, reporting progressively worsening swelling, redness, and discoloration of the right great toe over the prior three days. (Tr. 353). He reported significant neuropathy and noted that he did not feel pain in his toes. (Id.) He was diagnosed with cellulitis of his right toe and scheduled for a follow-up with his primary care provider. (Id.)

On December 1, 2020, consultative examiner Dr. Melita Konecke conducted an examination of Reznick. Reznick reported to Dr. Konecke that he has complications of diabetes with peripheral neuropathy in both his feet and hands with significant decreased sensation. (Tr. 389). Dr. Konecke noted a 2019 partial amputation of his left third toe due to infection and August 2020 debridement of his right great toe due to infection. (Id.) In addition to his complications from diabetes, Dr. Konecke noted he reported swelling in his right ankle from bone spurs since the 1980's which results in occasional discomfort, especially while walking any great distance, but that there is "nothing that they can do." (Id.) Reznick also attributed a hearing deficit in his left ear which requires the use of a hearing aid to a benign tumor he had removed in 1991. (Id.) As to his activities of daily living, Dr. Konecke

4

reported that Reznick lives with his spouse and requires help at home, does not cook or clean, but is able to drive, do laundry, shop, shower, watch TV, read, and listen to the radio, although he sometimes requires assistance dressing himself, especially with buttons. (Tr. 390). The examination revealed high blood pressure (160/98), but that he was in no acute distress with a normal gait and stance and full squat, though he lost balance when standing back up. (Tr. 391). He could not walk on heels or toes without difficulty but needed no held getting on and off the exam table, was able to rise from a chair without difficulty and brough no assistive device to the exam. (Id.) Dr. Konecke noted swelling around his right ankle, but otherwise noted stable, nontender joints, and negative SLR bilaterally with no pain and full strength in his upper and lower extremities. (Tr. 392). Dr. Konecke also observed that Reznick had intact hand and finger dexterity and was able to zipper and tie without difficulty. (Id.)

Reznick began seeing his primary care provider Dr. Stepanski in February 2021, and at his intake appointment it was noted that he had pain in his feet, hands, and legs, chronic right ankle pain from a previous injury. (Tr. 948). He was noted to be "tearful" at the intake appointment, stating that if he kept working, he was going to lose more of his toes or his feet. (Id.) An examination showed no weakness of his

extremities, but numbness, tingling, and pain of both and hand feet and swelling and decreased range of motion in his right ankle. (Tr. 953).

Reznick saw his PCP three times in March 2021, complaining of shaking, bilateral leg swelling, dizziness, and sweating. (Tr. 525-28, 896-901, 927). He reported muscle weakness in his legs and that they felt heavy and noted that the swelling in his legs is worse if he is walking or sitting down. (Tr. 525). On March 9, 2021, Dr. Stepanski noted 2+ nonpitting edema of both lower extremities on examination and recommended stopping amlodipine due to severe edema. (Tr. 901). On April 8, 2021, his neurologist noted, "he clearly has a diabetic sensory neuropathy causing numbness and tingling in high stocking and glove distribution," and prescribed low-dose nortriptyline at bedtime to help with sensory paresthesia from neuropathy.[2] (Tr. 520). A few weeks later at an appointment with an orthopedist for right ankle pain, an examination showed a large swollen ankle, diminished sensation and he was diagnosed with severe osteoarthritis of the right ankle. (Tr. 516). It was recommended he keep moving and use elastic ankle supports and compression stockings. (Id.) At the end of April 2021 he again reported to Dr. Stepanski that he was having trouble with his legs swelling when he stands or sits

---

[2] It is later noted in his medical records that Reznick declined nortriptyline. (Tr. 493)

for a long period of time and that his legs felt weak and heavy and that he experienced pain in all extremities. (Tr. 514).

In May 2021 it was again noted Reznick had persistent pain and leg weakness which limited extensive activity. (Tr. 507). A diabetic eye exam showed proliferative diabetic retinopathy in both eyes. (Tr. 502). On May 28, 2021, Reznick saw a vascular surgeon for evaluation of his bilateral lower extremity edema and leg weakness since August 2020. He reported leg weakness with walking and standing in both legs and that compression did not help his edema. (Tr. 493). The vascular surgeon noted he needed aggressive treatment of his edema of the lower legs to prevent further toe amputation and limb loss. (Tr. 496). An examination showed bilateral lower extremity edema with palpable pedal pulses, but good arterial circulation, and the vascular surgeon recommended compression and elevation of legs along with an ongoing workup of his neuropathy. (Tr. 497).

In June 2021 he saw Dr. Stepanski for diabetes management and it was noted that his blood sugars were controlled but that he was still experiencing constant pain in his legs, that his neuropathy had gotten progressively worse, and peripheral edema was also noted and discussed. (Tr. 484-87). He had to discontinue use of compression stockings because they were too tight and increased the swelling of his feet and ankles. (Tr. 484). He reported that he had no feeling in his hands and feet

7

and burnt his fingers by grabbing a pot he did not know was hot. (Tr. 485). A physical examination on July 28, 2021, showed +3 edema in his extremities but full motor strength, and he continued to report pain in his hands and feet, insensate feet, and inability to stand long periods because his shoes caused toe issues. (Tr. 468-71). He was advised to follow up with neurology to discuss alternative options since he did not wish to take the medication for his neuropathy. (Tr. 471).

In August 2021, Reznick was referred for a wound care follow-up from his endocrinologist for a new third toe ulcer. (Tr. 460). An examination showed full muscle strength but right ankle and hindfoot edema and limited ROM and he reported to Dr. Stepanski that his legs were weak, that he could only walk 200 feet due to weakness in his legs, that his legs felt heavy, and that he could not tell if he was wearing shoes because of the loss of sensation in his feet. (Tr. 458-63). He was told to continue on his current medications and return in six months. (Tr. 460). He saw podiatry on August 25, 2021, for a follow up on his left third toe ulcer and evaluation of a blister on his left posterior heel. (Tr. 445-48). An examination showed right ankle and hindfoot edema and limited ROM but full muscle strength. (Tr. 447-48). At his disability assessment with Dr. Stepanski in September 2021, he noted swelling had increased, that he cannot feel his hands or feet, and that no matter what shoes he wears his feet swell and rub causing ulcers. (Tr. 439-40). He reported

8

being in constant pain due to his neuropathy and having poor hand dexterity and no fine manipulation sensation. (Id.) He had recently been diagnosed with macular edema and was getting shots in his eyes every month. (Id.) An examination showed antalgic gait, sensory deficits in his hands, and edema and weakness in his legs. (Tr. 441).

In addition to the objective medical evidence, four medical sources opined as to the degree of Reznick's impairments. Based on her examination of Reznick and his reports of his subjective symptoms and activities of daily living, consultative examiner Dr. Konecke opined that he could continuously lift up to twenty pounds, but never more than twenty pounds, could continuously carry up to ten pounds and frequently carry up to twenty pounds but could never carry more than twenty pounds. (Tr. 394). She further opined that Reznick could sit for four hours, stand for two hours, and walk for one hour at a time and that he could sit for eight hours total in an eight-hour workday.[3] (Tr. 395). As to Reznick's extremities, Dr. Konecke opined that he could continuously reach and frequently handle, finger, feel, and push/pull

_____

[3] Dr. Konecke used a checkbox form for her RFC assessment and in the section which asks how many hours Reznick could stand and walk total in an eight-hour workday check both four and six hours next to stand and made no selection next to walk. (Tr. 395). The ALJ noted that Dr. Konecke indicated four and six for total hours of standing and considered only Dr. Konecke's opinion that Reznick could walk one hour at a time without noting how long he could walk total.

with both arms, could frequently operate foot controls with his right foot, and continuously operate foot controls with his left foot. (Tr. 396). She also opined that he could occasionally climb stairs and ramps, balance stoop, kneel, crouch, and crawl, but could never climb ladders or scaffolds, (Tr. 397), and that he could never be exposed to unprotected heights, could occasionally be exposed to moving mechanical parts, could frequently operate a motor vehicle, and had no limitations in his ability to be exposed to humidity, dust, odors, fumes, extreme cold, extreme heat, or vibrations, but that he could only tolerate moderate noise. (Tr. 398) In explaining her limitations, Dr. Konecke frequently noted Reznick's peripheral neuropathy in his hands and feet. (Tr. 394, 396)

On January 5, 2021, Dr. Louis Bonita reviewed the medical record and opined on Reznick's physical residual functional capacity. Dr. Bonita opined that Reznick could occasionally lift and/or carry twenty pounds; could frequently lift and or/carry ten pounds; could stand and/or walk for a total of six hours and sit for a total of six hours in an eight-hour workday; had no limitations in his ability to push and/or pull; and had no postural, manipulative, or visual limitations. (Tr. 62). Dr. Bonita further opined that Reznick had limited hearing in his left ear and used a hearing aid and should avoid concentrated exposure to noise and vibration. (Tr. 63). Dr. Bonita considered Reznick's treatment records and explained that the medical evidence

10

showed that despite ongoing treatment, Reznick continued to have pain which impacted his ability to perform work-related activities, but that he anticipated he would likely be able to sustain the limitations reflected in the RFC evaluation based on the medical evidence. (Tr. 66). Dr. Bonita also explained that, although certain aspects of the consultative examiner's opinion were consistent with the RFC determined in his decision, the examiner's report failed to reveal any significant clinical abnormalities. (Id.) Dr. Robert Czwalina reaffirmed the opinion of Dr. Bonia on reconsideration on May 11, 2021. (Tr. 79-83).

Reznick's treating physician, Dr. Suzanne Stepanski, also opined as to Reznick's ability to perform work-related activity on September 14, 2021. Dr. Stepanski opined that Reznick could sit for up to two hours total and stand for less than one hour total in an eight-hour workday and that he would need to alternate between sitting and standing every fifteen minutes. (Tr. 412). She further opined that he could occasionally lift up to ten pounds but never twenty pounds or more, could rarely push/pull with his upper or lower extremities, could occasionally reach and handle but never finger or feel, and should avoid noise, temperature extremes, vibration, humidity/wetness, and hazards. (Tr. 412-13). According to Dr. Stepanski, Reznick would need three to five unscheduled breaks per day, a walking break every thirty minutes, and excessive restroom breaks and leg elevation three to five times a

11

day. (Tr. 413). She also noted that Reznick would likely be absent from work four days or more per month due to his impairments. (Id.) Dr. Stepanski explained that Reznick would be unable to be gainfully employed due to his complex medical conditions including sensory neuropathy, uncontrolled diabetes mellitus and macular edema, that he is unable to ambulate for longer than thirty to forty-five minutes due to his amputations and complications of foot ulcers, and had dexterity issues due to his neuropathy including difficulty gripping. (Id.) She also explained that he would be unable to sit for longer than thirty minutes without changing positions and that he has significant depression from his loss of normal activities. (Id.)

Reznick also completed a function report on September 27, 2020 which stated he experiences extreme muscle weakness in his lower body and cannot feel his feet; he trips on things; has a hard time climbing and carrying heavy objects; trips on steps and uneven surfaces; has painful floating bone spurs in his right ankle; has no stamina; experiences swelling in his ankle and injuries to his feet including a right toe amputation and infections; and is dizzy and exhausted from his medication. (Tr. 226). He stated that he showers, does dishes and laundry, takes care of his dogs, and prepares meals weekly, uses a riding mower, but has a hard time buttoning his shirts and needs reminders for his medications. (Tr. 227-28). He reported going outside

every day "a lot," driving a car, shopping for groceries twice a week, and noted he was able to talk on the phone and text. (Tr. 229-30). Reznick's function report stated that his muscle weakness makes it difficult to lift anything, he can walk only about half an hour, steps make his legs hurt, and sitting or standing makes his legs swell. (Tr. 231). He also reported using a hearing aid and glasses (Tr. 232).

A telephonic disability hearing was conducted on October 14, 2021, at which Reznick testified about his symptoms, stating that he could only stand for 15-20 minutes, can walk for less than half an hour, and had to lay down and elevate his feet for swelling. (Tr. 43-44). He testified that neither compression socks nor diuretics helped to reduce the swelling in his legs. (Tr. 45). He testified that he cannot feel his fingers and is prone to burning them, has limited dexterity in his fingers and hands and has trouble grasping things, cannot tie his shoes and has trouble buttoning. (Tr. 45-47).

Following the hearing, the ALJ issued a partially favorable decision, finding that Reznick was not disabled prior to December 3, 2021, but became disabled on that date and had continued to be disabled through the date of the decision. (Tr. 16-30). In that decision, the ALJ first concluded that Reznick met the insured requirements of the Act through December 31, 2025, and had not engaged in substantial gainful activity since August 31, 2020, the alleged onset date. (Tr. 19).

At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Reznick had the following severe impairments: diabetes mellitus with peripheral neuropathy, status-post partial amputation of left 3rd toe, history of right ankle fracture, osteoarthritis in ankle, obesity, hearing deficit, status-post tumor in 1991. (Tr. 19).

At Step 3, the ALJ determined that Reznick did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 20). Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered Reznick's impairments as reflected in the medical record, and found that:

> After careful consideration of the entire record, the undersigned finds that since the alleged onset date, the claimant had the residual functional capacity to perform light exertional work with the following additional limitations. The claimant is limited to occasional balance, stoop, crouch, crawl, kneel, climb ramps and stairs, but never ladders ropes or scaffolds. The claimant is limited to frequent push/pull with the lower extremities including foot controls. The claimant is limited to frequent fine and gross manipulation with the upper extremities. The claimant is limited to frequent exposure to vibrations and can work in moderate level noise such as office noise. The claimant must be afforded a sit/stand option with each interval of sitting/standing being up to one hour maximum each time but not off task when transferring (20 CFR 404.1567).

(Tr. 22)

In fashioning the RFC, the ALJ considered the medical evidence and Reznick's own statements about the limitations caused by his impairments. The ALJ also relied upon the medical opinions and prior administrative medical findings, stating:

> The undersigned considered the opinions of the State agency medical consultants at the initial and reconsideration levels, who both provided a residual functional capacity for 12 months after the claimant's alleged onset date, indicating that the claimant would be capable of a reduced range of light exertional work with limited hearing on the left and avoidance of concentrated exposure to noise and vibration (Exhibits 1A; 3A). The undersigned finds these opinions persuasive, as they are supported by and consistent with the medical evidence of record and activities of daily living previously discussed. Specifically, the record shows that the claimant suffers from diabetes mellitus with peripheral neuropathy, status-post partial amputation of left 3rd toe, history of right ankle fracture, osteoarthritis in ankle, obesity, hearing deficit, and status post tumor in 1991, which collectively limit his ability to perform work-related activities beyond the light exertional level. However, the record also shows that the claimant's treatment has been relatively effective in controlling his symptoms and physical examinations have shown good strength in the upper and lower extremities and a consistently normal gait. The undersigned did further provide a sit/stand option based upon additional evidence that the State agency medical consultant's did not have the opportunity to review.
>
> After examining the claimant in December 2020, consultative medical examiner, Dr. Konecke indicated that the claimant could perform light exertional work with 8 hours total of sitting, 4 and 6 for total hours of standing, and walking 1 hour at a time. Dr. Konecke further indicated that the claimant could frequently use his hands, frequently use his right foot for operation of foot controls, and occasionally perform postural maneuvers, but never climb ladders or scaffolds (Exhibit 4F). The undersigned finds this opinion partially persuasive. Specifically, the

reduction to the light exertional level with respects to lifting, carrying, and sitting is persuasive, as it is consistent with and supported by evidence of the claimant's severe physical impairments, including diabetes with peripheral neuropathy, toe amputation, right ankle fracture, osteoarthritis, and obesity. However, the further reduction in standing (if meant to be only 4 hours), and walking is not consistent with or supported by Dr. Konecke's own physical examination findings that noted no acute distress, normal gait without an assistive device, normal stance, and 5/5 strength in the lower extremities. The undersigned did provide further limitations with regard to the sit/stand option due to the claimant's neuropathy. The undersigned also did not find the upper extremity limitations fully supported with regard to push pull. Although the record does support the frequent fine and gross manipulation, the claimant's upper extremity motor and range of motion remain normal.

Finally, the undersigned considered the Medical Source Statement provided by the claimant's primary care provider, Suzanne Stepanski, DO, who indicated that the claimant would be limited to less than sedentary exertional work (Exhibit 6F). The undersigned does not find this opinion persuasive, as it is clearly not supported by or consistent with the normal physical examination findings and the claimant's continued activities of daily living. Additionally, Dr. Stepanski's opinion is not supported by or consistent with the opinions of the State agency medical consultants and the consultative medical examiner.

(Tr. 24-25).

Having arrived at this RFC assessment, the ALJ issued a partially favorable decision. The ALJ first concluded that Reznick was unable to perform any past relevant work and that his acquired job skills did not transfer to other occupations within the residual functional capacity defined in the decision. (Tr. 26). The ALJ then concluded that, on December 3, 2021, Reznick's age category changed to

Advanced Age by applying the borderline age rules. Thus, when considering whether there were jobs that existed in significant numbers in the national economy that Reznick could have performed, the ALJ concluded that, prior to December 3, 2021, there were jobs that existed in significant numbers that he could have performed, but beginning on December 3, 2021, considering his Advanced Age, education, work experience, and RFC, there were no jobs that existed in significant numbers in the national economy that he could perform, since he would face significant vocational adversity in trying to transition to jobs within his RFC. (Tr. 27-28).

This appeal followed. (Doc. 1). On appeal, Reznick argues that the ALJ failed to properly evaluate the medical source opinions, resulting in an RFC that was not based on substantial evidence. For the reasons set forth below, we will remand this case.

## III. <u>Discussion</u>

### A. <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200

(3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——,

135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal

19

matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B.   <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); <u>see also</u> 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role

22

and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations

that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12,

2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366
(M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating
the existence of a medically determinable impairment that prevents him or her in
engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this
burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show
that jobs exist in significant number in the national economy that the claimant could
perform that are consistent with the claimant's age, education, work experience and
RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive
requisites. Most significant among these legal benchmarks is a requirement that the
ALJ adequately explain the legal and factual basis for this disability determination.
Thus, in order to facilitate review of the decision under the substantial evidence
standard, the ALJ's decision must be accompanied by "a clear and satisfactory
explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d
Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate
which evidence was accepted, which evidence was rejected, and the reasons for
rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his

decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

### C.   Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence

The plaintiff filed this disability application in September of 2020 after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness"

26

based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she

27

considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v.

> Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June
> 10, 2011). It follows that an ALJ can give partial credit to all medical
> opinions and can formulate an RFC based on different parts from the
> different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is

no evidence of any credible medical opinion supporting a claimant's allegations of

disability "the proposition that an ALJ must always base his RFC on a medical

opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

### D.      This Case Should Be Remanded For Further Consideration.

As we have noted, an ALJ's decision must be accompanied by "a clear and

satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704.

Furthermore, the ALJ must also "indicate in his decision which evidence he has

rejected and which he is relying on as the basis for his finding." Schaudeck, 181 F.3d

at 433. This cardinal principle applies with particular force to several types of

assessment made by ALJs. With respect to the instant case, it is well settled that

"[t]he ALJ must consider all relevant evidence when determining an individual's

residual functional capacity." Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001).

In the instant case the plaintiff argues that the ALJ failed to properly evaluate

the medical source opinions in fashioning the RFC. He specifically takes issue with

the ALJ's treatment and rejection of the opinion of Reznick's treating physician, Dr.

Stepanski. Indeed, in our view, the ALJ's evaluation of this evidence is flawed in several fundamental ways.

First, substantial evidence does not support the ALJ's characterization of Reznick's condition. For example, the ALJ stated:

> While peripheral neuropathy has been noted by the claimant's primary care provider, the claimant himself, and the consultative medical examiner, the claimant has had no sensory loss on examination, nor decrease in monofilament, and he was never diagnosed with such by his podiatrist.

(Tr. 24). This factual averment rejecting Reznick's symptoms of peripheral neuropathy because he has never formally diagnosed by a podiatrist is belied by the uncontradicted medical evidence, including a May 12, 2021, monofilament testing showing he was insensate (Tr. 506), and repeated reports by his podiatrist of loss of protective sensation in both feet (Tr. 436, 448, 463). Furthermore, the record, including Dr. Stepanski's treatment notes, is replete with unequivocal medical documentation of Reznick's progressively worsening peripheral neuropathy, (Tr. 535, 468, 485, 504, 520, 923), sensory loss in his hands and feet, (Tr. 436 (loss of protective sensation bilateral feet); 441 (sensory loss present, loss of sensation of bilateral hands, fine manipulation difficult); 465-66, (no feeling in feet, exam showed mild patchy insensate areas); 468 (insensate feet); 485 (no feeling in hands or feet); 504 (insensate feet); 516 (neurovascular status grossly intact although

diminished sensation); 520 ("He clearly has a diabetic sensory neuropathy causing numbness and tingling in high stocking and glove distribution"), and peripheral edema (Tr. 430, 436, 441, 447-48, 459, 463, 466, 470, 485, 496, 900-01).  Moreover, Reznick was consistent in his own reports that he cannot feel pain in his hands or toes and frequently burned himself because he could not feel temperature in his hands. (Tr. 45, 389, 439-40, 485). Thus, the RFC in this case rests upon a factual premise that is unsupported by, and in fact is contradicted by, substantial evidence.

The ALJ also seemingly relied solely upon reports of Reznick's normal gait in finding he was capable of light work, while acknowledging, but discounting, a host of other repeatedly reported neurological impairments. For example, the ALJ stated:

> After presenting to the emergency department in March 2021 with leg swelling, the claimant presented for a neurology consult the following month, which noted impaired fine motor skills, impaired gait per the claimant, and sensory disturbance below knee and bilateral glove distribution. However, such took place in the form of a tele-video appointment and did not result in any objective findings (Exhibit 7F/125). The record shows that the claimant was actually seen by orthopedics at that time and had right lower extremity swelling, mild pitting, a large swollen ankle, limited range of motion of ankle, and diminished sensation, but otherwise he was neurovascularly intact. Accordingly, it was recommended that the claimant keep moving and using compression stocking (Exhibit 7F/103). Fortunately, the records shows that the claimant exhibited a normal gait the following month (Exhibit 7F/93).

31

Thus, the ALJ's own statement of the evidence demonstrates that Reznick had consistently impaired sensation in his extremities and peripheral edema but was "otherwise" neurovascularly intact, although the ALJ does not articulate what the "otherwise" referred to, besides focusing solely on his normal gait. And, although the ALJ noted that Reznick's treatment had been relatively effective, including lower extremity swelling treated with compression socks, Reznick repeatedly reported that compression socks were not effective in treating his peripheral edema and that he was swelling through them. (Tr. 45, 458, 484, 493). The ALJ also relied upon normal examination findings, including neurologically, from a February 2021 appointment but the notes do not state any neurological examination findings at all – the space is blank – and no sensory or strength examination was conducted. (Tr. 583-84). In sum, although the ALJ cited sporadic examination findings of normal gait and strength in the opinion, these acute examination results do not reflect the overall level of impairment reflected when viewing the longitudinal record as a whole.

Moreover, the ALJ's treatment of Dr. Stepanski's opinion does not provide sufficient explanation to permit meaningful review. In rejecting the opinion of Reznick's treating physician, Dr. Stepanski, the ALJ stated:

> The undersigned does not find this opinion persuasive, as it is clearly not supported by or consistent with the normal physical examination findings and the claimant's continued activities of daily living.

> Additionally, Dr. Stepanski's opinion is not supported by or consistent with the opinions of the State agency medical consultants and the consultative medical examiner.

(Tr. 25). In this conclusory rejection of Dr. Stepanski's opinion, the ALJ does not reference the record or explain these stated inconsistencies. In the absence of some further explanation and articulation of its rationale, the ALJ's decision cannot be reconciled with the revised medical opinion regulations that the ALJ was obliged to follow. Those regulations eschew any hierarchical ranking of opinions, but call upon ALJ's to evaluate medical opinions against the following benchmarks:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.
> (3) Relationship with the claimant. This factor combines consideration of the issues in paragraphs (c)(3)(i) through (v) of this section.
> (i) Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).
> (ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).
> (iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s).

33

(iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s).

(v) Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.

20 C.F.R. § 404.1520c.

In this case, a dispassionate assessment of the treating source opinion that Reznick was capable of only less than sedentary work against these regulatory criteria continues to cast grave doubt upon the sufficiency of the ALJ's medical opinion analysis. Indeed, in our view, all of the factors relating to Reznick's relationship with Dr. Stepanski favored recognizing the persuasive power of this opinion. Thus, Reznick had a longstanding, first-hand treatment relationship with Dr. Stepanski that involved repeated contacts giving her a uniquely valuable longitudinal perspective on Reznick's physical impairments, a fact which the ALJ failed to sufficiently assess in her analysis. Instead, the ALJ relied upon the consultative examination results which, themselves, appeared to be inconsistent with the balance of the subsequent treatment records showing significant worsening peripheral neuropathy, sensory loss in his hands and feet, and peripheral edema.

Further, given that "supportability ... and consistency ... are the most important factors [to] consider when [ ] determine[ing] how persuasive [to] find a medical source's medical opinions ... to be," 20 C.F.R. § 404.1520c(b)(2), we find that the ALJ's evaluation of the treating source opinion failed to adequately address several critical factors. The ALJ stated in a conclusory manner that Dr. Stepanski's opinion was inconsistent and unsupported by the medical record, but this statement ignores the fact that her medical opinion was supported in many instances by her own contemporary treatment records, which documented the precise degree of severe impairments she described in her opinion. Moreover, although the ALJ also rejected Dr. Stepanski's opinion as inconsistent with the other three medical source opinions, as the plaintiff points out, the consultative examination was conducted in December 2020, and the opinions of Dr. Konecke and Drs. Bonia and Czwalina were based upon an incomplete record, which did not include the bulk of the treatment notes from 2021, including the May 2021 monofilament exam showing he was insensate and the majority of the specialist treatment notes showing progressively worsening peripheral neuropathy, sensory loss in his hands and feet, and peripheral edema. Moreover, the opinion of Dr. Konecke ambiguously noted that Reznick could stand and walk both four- and six-hours total in an eight-hour day and did not opine as to how long he could stand. (Tr. 395).

35

Thus, we conclude that the ALJ's decision in this case is not supported by substantial evidence, as the ALJ did not offer an adequate explanation for cursory rejection of the treating physician's opinion, without any meaningful analysis of the benchmarks required by the regulations, coupled with the ALJ's mischaracterization of the treatment records which tend to show Reznick suffered from an array of impairments which would affect his ability to perform work-related activity in crafting the RFC. Accordingly, we will remand this case to the Commissioner for further consideration of this evidence. Because we have found a basis for remand on these grounds, we need not address any other arguments on appeal. To the extent that any other error occurred, it may be remedied on remand. Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, this case will be REMANDED for further consideration.

An appropriate order follows.

_s/ Martin C. Carlson_
Martin C. Carlson
United States Magistrate Judge

DATED: May 22, 2024